UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

ALLSTATE INSURANCE COMPANY, ALLSTATE FIRE AND CASUALTY
INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY AND
ALLSTATE PROPERTY AND CASUALTY INSURANCE COMPANY,

                                                        Plaintiffs,

        -against-

ARTHUR YUSUPOV, GAOGUI LEASING CORP, JOHN DOES
1 THROUGH 5 AND ABC CORPORATIONS 1 THROUGH 5,

                                                        Defendants.

CIVIL ACTION

24-CV-1829

COMPLAINT

(TRIAL BY JURY
DEMANDED)

Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company (hereinafter "**Plaintiffs**"), by their attorneys, Morrison Mahoney LLP, for their Complaint against Defendants Arthur Yusupov ("Yusupov"), Gaogui Leasing Corp ("Gaogui") (Yusupov and Gaogui are collectively referred to as "**Retail Defendants**"), John Does 1 through 5, and ABC Corporations 1 through 5 (collectively "**Defendants**") allege as follows:

## PRELIMINARY STATEMENT

1.      From at least February of 2018 and continuing through the date of the filing of this Complaint, Defendants engaged in a scheme to defraud automobile insurance companies, including Plaintiffs, through New York State's No-fault system.

2.      This action seeks to recover more than $283,000.00 that Defendants stole from Plaintiffs through the submission of hundreds of false and/or fraudulent insurance claims for rental pain management durable medical equipment ("DME") devices, in particular Vascutherm compression devices ("Cold Compression Devices"), deep vein thrombosis devices ("DVT Compression Devices") and continuous passive motion ("CPM") machines (collectively, "Rental DME"). As used herein, (i) "DME" generally refers to equipment and/or supplies used for medical

purposes by individuals in their homes, including, among other things, cervical pillows, cervical traction units, cold/hot water circulating pumps, EMS units, hot/cold packs, infrared heat lamps, lumbar cushions, massagers, mattresses, whirlpools, sustained acoustic medicine devices, continuous passive motion devices and/or compression devices; and (ii) "orthotic devices" generally refers to items that are used to support a weak or deformed body member or to restrict or eliminate movement for medical purposes.  Such items include, but are not limited to, back braces, cervical collars, knee braces, shoulder braces and wrist braces.

3.      At all relevant times mentioned herein, each and every piece of Rental DME supplied by Gaogui was provided pursuant to a predetermined course of treatment, irrespective of medical necessity, based on illicit kickback and/or other financial compensation agreements between and among one or more of the Defendants and the No-fault Clinics, as defined below.

4.      To execute the scheme to defraud alleged herein, Defendant Yusupov, through Gaogui, entered into separate arrangements with one or more of the Wholesale Defendants, and one or more medical clinics operating in the New York metropolitan area that bills No-fault insurers for medical services (hereinafter "No-fault Clinics").

5.      Pursuant to these arrangements and in exchange for kickbacks and/or other financial compensation, the managers, owners and/or controllers of No-fault Clinics, which are not named as defendants in this action, facilitated the scheme in several ways, including but not limited to:

(i) ensuring that their associated doctors and/or chiropractors (hereinafter "Health Care Practitioners" or "HCPs") prescribed large amounts of virtually identical DME, including Rental DME, to their patient population, pursuant to a predetermined course of treatment irrespective of medical necessity, with the prescribed items being dictated by the Defendants, among others;

(ii) ensuring that the prescriptions were sufficiently generic and/or formulaic so that the nature, quality and cost and medical necessity of any DME could not be verified based on the description of the prescribed item alone; and/or

(iii) ensuring that the prescriptions were provided directly to Gaogui to ensure that Gaogui could bill Plaintiffs to purportedly fill the prescription rather than allow the possibility that the Covered Person may fill the prescription at a DME retailer of their own choosing.

6.      The use of generic and/or formulaic descriptions in the fraudulent prescriptions enabled the Retail Defendants to: (i) misrepresent the nature and quality of the Rental DME prescribed and dispensed to the patient, if any items were legitimately prescribed and dispensed at all; (ii) misrepresent the medical necessity  of the items that were dispensed to the patient, if any items were dispensed at all; and (iii) fraudulently bill for products that would result in the highest forms of reimbursement from insurers, in general, and Plaintiffs, in particular.

7.      Pursuant to the fraudulent prescriptions, Gaogui routinely provided (or purported to provide) a nearly identical battery of Rental DME for the same and/or similar duration, to persons injured in automobile accidents insured by Plaintiffs (hereinafter "Covered Persons"), regardless of medical necessity, in order to maximize reimbursement from insurers in general, and Plaintiffs in particular.

8.      On information and belief, the Retail Defendants then paid kickbacks or other forms of compensation to the No-fault Clinics for the fraudulent prescriptions, which were transmitted directly by the Clinics to the Retail Defendants to support their claims for reimbursement.

9.      After obtaining the fraudulent prescriptions from the No-fault Clinics, Yusupov, through Gaogui, generated and submitted bills to Plaintiffs, among others, knowingly misrepresenting the nature and quality of the items, the amounts they were entitled to be reimbursed and/or the medical necessity of the purportedly prescribed Rental DME.

10.     In carrying out the scheme to defraud, Defendants stole in excess of $283,000.00 from Plaintiffs by submitting, causing to be submitted or facilitating the submission of fraudulent claims for persons who allegedly sustained injuries covered by the New York State Comprehensive Motor Vehicle Insurance Reparations Act, Ins. Law §§ 5101, *et seq.* (popularly known as the "No-fault Law").

## STATUTORY/REGULATORY SCHEME

11.     Pursuant to the No-fault Law, Plaintiffs are required to pay, *inter alia*, for health service expenses that are reasonably incurred as a result of injuries suffered by occupants of their insured motor vehicles or pedestrians, which arise from the use or operation of such motor vehicles in the State of New York.  Covered Persons can also assign these benefits to doctors and other properly licensed healthcare providers, including DME retailers, enabling them to bill insurance companies directly for their services.

12.     As alleged herein, Defendants exploited and continue to exploit this system by obtaining such assignments and billing Plaintiffs for Rental DME that was never provided, not provided as billed or, if provided, was otherwise medically unnecessary and provided pursuant to fraudulent prescriptions in conformity with a predetermined course of treatment in which virtually all Covered Persons received substantially similar DME and/or orthotic devices.  Exhibit "1" in the accompanying Compendium of Exhibits is a representative sample of claims paid by Plaintiffs

to Defendants for medical equipment and/or other services provided pursuant to fraudulent prescriptions based upon a predetermined course of treatment, irrespective of medical necessity.

13.     Defendant Gaogui is ostensibly a DME supply company that bills for medical supplies provided to, among others, individuals covered under the No-fault Law.  In exchange for its services, Gaogui accepted (and continues to accept) assignments of benefits from Covered Persons and submitted (and continues to submit) claims for payment to No-fault insurance carriers, in general, and to Plaintiffs, in particular.

14.     In accordance with the No-fault Law and 11 N.Y.C.R.R. §§ 65 *et seq*., Gaogui submitted (and continues to submit) claims to Plaintiffs using the claim forms prescribed by the New York State Department of Financial Services ("DFS," f/k/a the Department of Insurance), including the "No-Fault Assignment of Benefits Form" or form "NF-AOB" and a bill in the form of the "Verification of Treatment by Attending Physician or Other Provider of Health Service" or "NYS form NF-3" (hereinafter "NF-3"), or a substantially similar form (such as the "Health Insurance Claim Form" or "CMS Form 1500").

15.     At all relevant times mentioned herein, pursuant to Section 403 of the New York State Insurance Law, the claim forms submitted to Plaintiffs by Gaogui contained the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for commercial insurance or statement of claim for any commercial or personal insurance benefits containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto…commits a fraudulent insurance act, which is a crime….

16.     At all relevant times mentioned herein, Retail Defendants identified the DME it purported provided to Covered persons on the claim forms using Healthcare Common Procedure Coding System (HCPCS) Level II Codes, a standardized coding system maintained by the Centers

for Medicare & Medicaid Services (CMS) used to identify services not identified in the American Medical Association's Current Procedural Terminology (CPT) code set, including, *inter alia* durable medical equipment and orthotic devices.

17.    At all relevant times mentioned herein, pursuant to the No-fault Law and implementing regulations, as well as the applicable policies of insurance, Plaintiffs were (and are) required to promptly process claims within 30 days of receipt of proof of claim.

18.    At all relevant times mentioned herein, Section 5108 of the No-fault Law circumscribes the amount that a licensed healthcare provider or other authorized person, such as a DME provider, may recover for health service-related expenses. Under this section, such persons are only entitled to reimbursement of necessary medically related expenses in accordance with the applicable fee schedules established by the Chairman of the Workers' Compensation Board and adopted by the Superintendent of the DFS.

19.    By Opinion Letter dated June 16, 2004, entitled "No-Fault Fees for Durable Medical Equipment," the New York State Insurance Department recognized the harm inflicted on insureds by inflated DME charges:

> [A]n injured person, with a finite amount of No-Fault benefits available, having assigned his rights to a provider in good faith, would have DME items of inflated fees constituting a disproportionate share of benefits, be deducted from the amount of the person's No-Fault benefits, resulting in less benefits available for other necessary health related services that are based upon reasonable fees.

20.    At all relevant times mentioned herein, pursuant to Ins. Law § 5108, the Superintendent of the DFS adopted, by promulgation of Regulation 83, the Workers' Compensation Board ("WCB") Fee Schedules for determining the maximum permissible reimbursement amounts for which health care providers may charge for services provided to Covered Persons under the No-fault Law. 11 N.Y.C.R.R. § 68.1.

21.     At all relevant times mentioned herein, Regulation 83 did not adopt the Workers' Compensation Fee Schedules with respect to "workers' compensation claim forms, pre-authorization approval, time limitations within which health services must be performed, enhanced reimbursement for providers of certain designated services...."

22.     Effective October 6, 2004, the Department of Financial Services, through the Superintendent's promulgation of the 28th Amendment to Regulation 83 (11 N.Y.C.R.R. § 68 *et. Seq.*), established a fee schedule for the reimbursement of durable medical equipment and medical supplies by adopting the New York State Medicaid fee schedules for durable medical equipment, medical/surgical supplies, orthopedic footwear, and orthotic and prosthetic appliances.

23.     The 28th Amendment to Regulation 83 provided:

> [The] maximum permissible charge for the purchase of durable medical equipment, medical/surgical supplies, orthopedic footwear and orthotic and prosthetic appliances is the fee payable for such equipment and supplies under the New York State Medicaid program at the time such equipment and supplies are provided. If the New York State Medicaid program has not established a fee payable for the specific item, then the fee payable, in accordance with Medicaid rules, shall be the *lesser* of: (1) the acquisition cost (i.e. the line item cost from a manufacturer or wholesaler net of any rebates, discounts or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50%; or (2) the usual and customary price charged to the general public.

11 N.Y.C.R.R. § 68 (Appendix 17-C, Part F) (effective through July 10, 2007).

24.     Effective July 11, 2007, for DME and/or orthotic devices provided up to and including April 3, 2022, the WCB established a fee schedule for DME and/or orthotic devices by also adopting the New York State Medicaid fee schedule for durable medical equipment, medical/surgical supplies, orthopedic footwear and orthotic and prosthetic appliances (hereinafter the "Fee Schedule"), 12 N.Y.C.R.R. § 442.2(a) (effective through June 7, 2021), which lists such devices by corresponding NCPCS Level II code.

7

25.     In view of the adoption by the WCB of the New York State Medicaid DME Fee Schedule, on or about April 16, 2008, the DFS promulgated the 30th Amendment to Regulation 83, which repealed Part F of Appendix 17-C, since it was no longer needed due to the DFS' prior adoption of the WCB's fee schedule, which then included the Fee Schedule that was in effect at all relevant times mentioned herein.

26.     Accordingly, at all relevant times mentioned herein providers of DME and/or orthotic devices were entitled to reimbursement in the amounts set forth in the Fee Schedule.  At all relevant times mentioned herein, for DME and/or orthotic devices not listed on the Fee Schedule ("Non-Fee Schedule" items), the provider is only entitled to reimbursement in an amount equal to the *lesser* of either: (i) the net acquisition cost of the medical equipment to the provider, plus 50%, or (ii) the usual and customary price charged to the public. 11 N.Y.C.R.R. § 68.1; 12 N.Y.C.R.R. § 442.2(a) (effective through June 7, 2021) (sometimes referred to herein as the "Lesser of Standard").

27.     At all relevant times mentioned herein under the Fee Schedule, providers of rental DME were limited to a maximum permissible monthly rental charge as follows: "equipment, supplies and services provided on a rental basis shall not exceed the lower of the monthly rental charge to the general public or the price determined by the New York State Department of Health area office. The total accumulated monthly rental charges shall not exceed the fee amount allowed under the Medicaid fee schedule."  12 N.Y.C.R.R. § 442.2(b) (effective through June 7, 2021).

28.     At all relevant times mentioned herein the total monthly rental charge for equipment, supplies and services billed under codes listed in the Fee Schedule is ten percent (10%) of the listed maximum reimbursement amount.

29.     At all relevant times mentioned herein for DME billed under HCPCS codes that are recognized under the Fee Schedule, but do not contain a maximum reimbursement amount, the maximum charge for a monthly rental is ten percent (10%) of the acquisition cost for the DME, which includes all supplies that are provided with the DME rental. *See Government Emp. Ins. Co. v. MiiSupply LLC,* Index No. 616953/18, Docket No.: 43 (N.Y. Sup. Ct. Nassau Cty., Dec. 4, 2019).

30.     At all relevant times mentioned herein, the maximum permissible monthly charge for durable medical equipment, medical/surgical supplies, and orthotic and prosthetic appliances provided on a rental basis is "payment in full and there are no separate and/or additional payments for shipping, handling, and delivery." 12 N.Y.C.R.R. § 442.2(c) (effective through June 7, 2021).

31.     By Board Bulletin Numbers 046-1408, dated May 24, 2021, and 046-1496, dated February 3, 2022, the Chair of the WCB delayed the implementation of amendments to 12 N.Y.C.R.R. §§ 442.2, 442.4 and 442.5, which was to become effective June 7, 2021, with the result that the Medicaid DME Fee Schedule and the Lesser of Standard remained effective for Workers' Compensation and No-fault claims until the completion of Phase 2 of the WCB's implementation of its new electronic claims management system, OnBoard, on April 4, 2022. New York Workers' Compensation Board Bulletin No. 046-1408 (May 24, 2021) (http://www.wcb.ny.gov/content/main/SubjectNos/ sn046_1408.jsp) and Bulletin No. 046-1496 (Feb. 3, 2022) (http://www.wcb.ny.gov/content/main/ SubjectNos/sn046_1496.jsp).

32.     At all relevant times mentioned herein, pursuant to Section 5108© of the No-fault Law, "no provider of health services . . . may demand or request any payment in addition to the charges authorized pursuant to this section."

33.   Moreover, to be eligible for reimbursement under the No-fault Law during all relevant times mentioned herein, all claims for reimbursement must include a description of the "full particulars of the nature and extent of the . . . treatment received," including DME. *See* 11 N.Y.C.R.R. § 65-1.1.

34.   At all relevant times mentioned herein, nearly each and every bill mailed to Plaintiffs by Yusupov, through Gaogui, sought reimbursement in excess of the amounts authorized by the No-fault Law, by materially misrepresenting the Rental DME and accompanying accessories provided, if provided at all, as well as the nature, quality, and medical necessity of the billed-for Rental DME and accompanying accessories.   To the extent the Rental DME and accompanying accessories were provided at all, each item was medically unnecessary because it was provided pursuant to a predetermined course of treatment, irrespective of medical need, and was billed in an amount far in excess of what the Retail Defendants were entitled to be reimbursed.

35.   On information and belief, in furtherance of the scheme to defraud alleged herein, Gaogui as a matter of pattern, practice, and protocol, routinely provided Covered Persons with expensive Rental DME that was medically unnecessary and provided as part of an elaborate kickback scheme for unnecessary referrals in order to maximize reimbursement.

36.   As part of a fraudulent protocol of treatment, in addition to receiving a standard battery of medical treatment, including the provision of several pieces of DME such as cervical pillows, cervical traction units, cold/hot water circulating pumps, EMS units, infrared heat lamps, lumbar cushions, massagers, mattresses, whirlpools, back braces, cervical collars, knee braces, shoulder braces, sustained acoustic medicine devices, cervical traction units and/or continuous passive motion devices from other DME retailers, Gaogui delivered expensive rental pain management DME and/or compression devices to Covered Persons that are not medically

necessary and/or are provided pursuant to a kickback arrangement or for other financial consideration.  In most cases, Covered Persons receive a Cold Compression Device, Compression Device, DVT Compression Device, and/or CPM machine from Gaogui, all medically unnecessary items, for up to 28 days or longer, averaging upwards of $2,200.00 in a total cost of the items, as part of the scheme to financially enrich Gaogui, through a fraudulent protocol of treatment, all while significantly diminishing the coverage available for medically necessary services, to the extent the Covered Persons were actually injured and in need of treatment.

37.     On information and belief, Gaogui was created for the purpose of participating in the fraudulent billing of insurance companies under the No-fault Law.

38.     On information and belief, every aspect of Defendants' fraudulent scheme was motivated by money, without regard to the grave harm inflicted on the public at large by the Defendants, who, to the extent that they provided any Rental DME at all, provided Covered Persons with inferior, low-quality items, or items that directly contravened the treatment plan indicated by the treating physicians, potentially compromising patients' health.

39.     The duration, scope and nature of the Defendants' illegal conduct bring this case well within the realm of criminal conduct to which the Racketeer Influenced and Corrupt Organizations Act ("RICO") applies. Defendants did not engage in sporadic acts of fraud— although that would be troubling enough—rather, they adopted fraudulent blueprints as their business plans and used them to participate in systematic patterns of racketeering activity.  Every facet of Defendants' operations, from securing fraudulent prescriptions for Rental DME pursuant to a predetermined course of treatment, that misrepresented the nature, quality, cost, and medical

necessity for the Rental DME purportedly provided, was carried out for the purpose of committing fraud.

40.     This lawsuit seeks to, among other things, enforce the plain language of the No-fault Law and implementing regulations, as well as its underlying public policy, which limits reimbursement of No-fault benefits to legitimate insurance claims for DME and/or orthotic devices.  In doing so, Plaintiffs seek compensatory damages and declaratory relief that Plaintiffs are not required to pay any of Gaogui's No-fault claims because Yusupov, through Gaogui, submitted (1) false and fraudulent insurance claims for medically unnecessary Rental DME and accompanying accessories to Plaintiffs deliberately misrepresenting the amounts they were entitled to be reimbursed; and/or (2) false and fraudulent insurance claims to Plaintiffs for Rental DME and accompanying accessories that, to the extent anything was provided at all, was provided pursuant to a predetermined protocol of treatment without regard to medical necessity.  Such claims continue to be submitted by and/or in the name of Gaogui and are, or can be, the subject of No-fault collection actions and/or arbitrations to recover benefits, and thus, constitute a continuing harm to Plaintiffs.

41.     By way of example and not limitation, Exhibit "2" in the accompanying Compendium of Exhibits is a spreadsheet listing a representative sample of the in excess of $286,000.00 in unpaid No-fault claims that form the basis of Plaintiffs' request for declaratory relief.

## NATURE OF THE ACTION

42.     This action is brought pursuant to:

  i)     The United States Racketeer Influenced and Corrupt Organizations Act ("RICO"); 18 U.S.C. §§ 1961, 1962(c) and 1964(c);

ii)     New York State common law; and

iii)    the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

## NATURE OF RELIEF SOUGHT

43.     Pursuant to 18 U.S.C. § 1964(c), Plaintiffs seek treble damages, which they sustained as a result of the Defendants' scheme to defraud and acts of mail fraud in connection with their use of the facilities of the No-fault system to fraudulently obtain payments from Plaintiffs for Rental DME and accompanying accessories they allegedly provided to individuals covered by Plaintiffs under New York State's No-fault Law.

44.     Plaintiffs further seek a judgment declaring that they are under no obligation to pay any of Gaogui's unpaid No-fault claims because:

i)      The Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs to obtain reimbursement far in excess of the maximum permissible amount they could submit to Plaintiffs; and/or

ii)     The Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs seeking reimbursement for DME and accompanying accessories that were provided pursuant to a predetermined protocol of treatment without regard to medical necessity.

45.     As a result of Defendants' actions alleged herein, Plaintiffs were defrauded of an amount in excess of $283,000.00, the exact amount to be determined at trial, in payments which Defendants received for fraudulently billing Plaintiffs for Rental DME and accompanying accessories that were never provided or, if provided, not provided as billed and/or provided pursuant to fraudulent prescriptions in accordance with a predetermined course of treatment, irrespective of medical need.

## THE PARTIES

### A.    Plaintiffs

46.    Plaintiff Allstate Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

47.    Plaintiff Allstate Fire and Casualty Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

48.    Plaintiff Allstate Indemnity Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

49.    Plaintiff Allstate Property and Casualty Insurance Company is a corporation duly organized and existing under the laws of the State of Illinois, having its principal place of business in Northbrook, Illinois.

50.    Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, Allstate Indemnity Company, and Allstate Property and Casualty Insurance Company are collectively referred to herein as "Plaintiffs."

51.    Plaintiffs are duly organized and licensed to engage in the writing of automobile insurance policies in the State of New York and provide automobile insurance coverage to their policyholders under and in accordance with New York State la

### B.    The Individual Defendant

52.    Arthur Yusupov ("Yusupov") is a natural person residing in the State of New York, is the principal, officer, and/or director of Retail Defendant Gaogui, and, at all times relevant herein, operated, managed, and/or controlled its activities.

**C.      The Retail Defendant**

53.      Gaogui Leasing Corp ("Gaogui") was formed on or about February 2, 2018, and purports to be a retail DME supply company, authorized to do business in the State of New York, with its principal place of business located at 70 E. Sunrise Highway, Suite 500, Rockville Center, New York 11581.  Gaogui is operated, managed, and/or controlled by Defendant Yusupov and submitted fraudulent claims to Plaintiffs seeking reimbursement for Rental DME and accompanying accessories under the No-fault Law.

**D.      The John Doe Defendants**

54.      On information and belief, John Does 1 through 5 are individuals who conspired, participated, conducted, and assisted in the fraudulent and unlawful conduct alleged herein. These individuals will be added as defendants when their names and the extent of their participation become known through discovery.

**E.      The ABC Corporations**

55.      On information and belief, the ABC Corporations 1 through 5 are additional companies that are unknown to Plaintiffs that are owned, controlled, and operated by one or more of the John Doe Defendants, which were used in connection with the kickback scheme with the Defendants alleged herein to obtain referrals, prescriptions and/or patients in furtherance of the scheme.  These ABC Corporations 1 through 5 will be added as defendants when their names and the full extent of their participation become known through discovery.

**JURISDICTION AND VENUE**

56.      Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over the claims brought under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.* because they arise under the laws of the United States.

57.     This Court also has jurisdiction over the subject matter of this action under 28 U.S.C. § l332 because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

58.     This Court also has supplemental jurisdiction over the claims arising under state law pursuant to 28 U.S.C. § 1367(a).

59.     Pursuant to 18 U.S.C. § 1965, 28 U.S.C. § 1367 and New York CPLR § 302(a), this Court has personal jurisdiction over any non-domiciliary defendant.

60.     Venue lies in this District Court under the provisions of 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b) as the Eastern District of New York is the district where one or more the Defendants reside and because this is the district where a substantial amount of the activities forming the basis of the Complaint occurred.

## FACTUAL BACKGROUND AND ALLEGATIONS APPLICABLE TO ALL CAUSES OF ACTION

61.     Plaintiffs underwrite automobile insurance in New York State and participate as insurers in New York State's No-fault program.

62.     As set forth in the Statutory/Regulatory Scheme section above, pursuant to the No-fault Law, Plaintiffs are required to pay for, *inter alia*, health service expenses that are reasonably incurred as a result of injuries suffered by occupants of their insured motor vehicles and pedestrians that arise from the use or operation of such motor vehicles in the State of New York.

63.     Gaogui is ostensibly a DME supply companies that bills for medical supplies provided to, among others, individuals covered under the No-fault Law.  In exchange for its services, Gaogui accepts assignments of benefits from Covered Persons covered under the No-fault Law and submit claims for payment to No-fault insurance carriers, in general, and to Plaintiffs, in particular.

64.     To process and verify the claims submitted by Gaogui, Plaintiffs required, and Gaogui submitted, prescriptions and other documents relating to the Rental DME allegedly supplied to Covered Persons for which Gaogui was seeking reimbursement from Plaintiffs.

65.     In nearly all instances, the prescriptions submitted in support of Gaogui's claims for reimbursement were fraudulent, fabricated, duplicated and/or issued pursuant to a pre-determined treatment protocol, regardless of medical necessity.

66.     At all relevant times mentioned herein, in each bill submission to No-fault insurers in general, and Plaintiffs in particular, Gaogui made the following representations to each recipient:

- The bill for Rental DME was based on a valid prescription by a healthcare practitioner licensed to issue such prescriptions;

- The prescription for Rental DME was not issued pursuant to any unlawful financial arrangements;

- The DME identified on the bill was actually provided to the Covered person based on a valid prescription identifying medically necessary items;

- The billing code used on the bill actually represents the Rental DME and all included services that was provided to the Covered Person; and

- The fee sought for the billed for Rental DME and accompanying accessories did not exceed that permissible under the No-fault law and regulations.

67.     Pursuant to the No-fault Law and implementing regulations, as well as the applicable policies of insurance, Plaintiffs are required to promptly process Gaogui's claims within 30 days of receipt of proof of claim.

68.     To fulfill their obligation to promptly process claims, Plaintiffs justifiably relied upon the bills and documentation submitted by Gaogui in support of its claims, and paid Gaogui based on the representations and information contained in the bills and documentation that Defendants mailed to Plaintiffs.

69.     At all relevant times mentioned herein, the No-fault Law provides that the maximum permissible charge for the purchase of durable medical equipment, medical/surgical supplies and orthotic and prosthetic appliances is the fee payable for such equipment and supplies under the relevant fee schedule established by the Worker's Compensation Board, as adopted by the Superintendent of the DFS. N.Y. Ins. Law § 5108; 11 N.Y.C.R.R. 68.1(a).

70.      At all relevant times mentioned herein, the Worker's Compensation Board has adopted the fee schedule set by the New York State Medicaid program at the time such equipment and supplies are provided. 12 N.Y.C.R.R. § 442.2. (effective through June 7, 2021)

71.     At all relevant times mentioned herein, with respect to DME and/or medical supplies for which the New York State Medicaid program has not established a fee ("Non-Fee Schedule" items), the regulation provides that the fee payable shall be the lesser of:

   (1)    the acquisition cost (*i.e.*, the line item cost from a manufacturer or wholesaler net of any rebates, discounts or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50 percent; or

   (2)    the usual and customary price charged to the general public.

12 N.Y.C.R.R § 442.2. (effective through June 7, 2021).

72.     At all relevant times mentioned herein, the regulation provides that suppliers of rental DME were limited to a maximum permissible monthly rental charge as follows: "equipment, supplies and services provided on a rental basis shall not exceed the lower of the monthly rental charge to the general public or the price determined by the New York State Department of Health area office. The total accumulated monthly rental charges shall not exceed the fee amount allowed under the Medicaid fee schedule." 12 N.Y.C.R.R. § 442.2(b) (effective through June 7, 2021).

73.     At all relevant times mentioned herein prior to April 4, 2022, the total monthly rental charge for equipment, supplies and services billed under codes listed in the Fee Schedule is ten percent (10%) of the listed maximum reimbursement amount.

74.     At all relevant times mentioned herein prior to April 4, 2022, for DME billed under HCPCS codes that are recognized under the Fee Schedule, but do not contain a maximum reimbursement amount, the maximum charge for a monthly rental is ten percent (10%) of the acquisition cost for the DME, which includes all supplies that are provided with the DME rental. *See Government Emp. Ins. Co. v. MiiSupply LLC,* Index No. 616953/18, Docket No. 43 (N.Y. Sup. Ct. Nassau Cty., Dec. 4, 2019).

75.     Furthermore, at all relevant times mentioned herein, "[t]he maximum permissible charge for the purchase of durable medical equipment, medical/surgical supplies, and orthotic and prosthetic appliances and the maximum permissible monthly rental charge for such equipment, supplies, and services provided on a rental basis as set forth in subdivisions (a) and (b) of this section are payment in full and there are no separate and/or additional payments for shipping, handling, and delivery." 12 N.Y.C.R.R. § 442.2(c) (effective through June 7, 2021).

76.     The Chair of the WCB delayed the implementation of amendments to 12 N.Y.C.R.R. §§ 442.2, 442.4 and 442.5, which were to become effective June 7, 2021, with the result that the Medicaid DME fee schedule and the Lesser of Standard remained effective for Workers' Compensation and No-fault claims until April 4, 2022.

77.     Gaogui was created in connection with an elaborate scheme to fraudulently bill No-fault insurance carriers for Rental DME and accompanying accessories that were never provided, were not provided as billed or, if provided, were otherwise medically unnecessary and provided

pursuant to a predetermined course of treatment in which virtually all Covered Persons received the same or similar battery of DME and/or orthotic devices.

78.     The Rental DME that Gaogui purported to provide, and for which it billed Plaintiffs, seldom varied from patient-to-patient over a given period of time and also did not change based on any differences in the patients' condition, age, complaints, type of accident, or nature of alleged injury.  Instead, Yusupov, through Gaogui, created a billing apparatus which implemented a portion of a pre-determined treatment protocol that was designed to drain the maximum amount of dollars from insurance companies for each and every patient, including those who required little or no DME at all.

79.     Yusupov created and controlled Gaogui, which was part of a well-organized illegal enterprise that engaged in pervasive fraudulent practices that distinguished it from legitimate providers of Rental DME, DME and/or orthotic devices.  The components of the enterprise followed practices that were part of a racketeering scheme dictated by Yusupov, including, but not limited to, one of more of the following practices:

- Unlike legitimate retail DME companies, Yusupov, through Gaogui, misrepresented the nature, quality, and cost of DME purportedly provided to Covered Persons;

- Unlike legitimate retail DME companies, Yusupov, through Gaogui, submitted bills to Plaintiffs misrepresenting the amounts they were entitled to be reimbursed under the No-fault Law;

- Unlike legitimate retail DME companies, Yusupov, through Gaogui, submitted bills to Plaintiffs for Rental DME that was never provided to Covered Persons;

- Unlike legitimate retail DME companies, Yusupov, through Gaogui, misrepresented the wholesale costs and/or usual and customary price of the Non-Fee Schedule items purportedly supplied to Covered Persons;

- Unlike legitimate retail DME companies, Yusupov, through Gaogui, submitted prescriptions and bills to Plaintiffs for Rental DME that generically described the item(s) so as to conceal the type of item(s) being prescribed and/or provided as well as the medical necessity for the items;

- Unlike legitimate retail DME companies, Yusupov, through Gaogui, concealed the fact that the Rental DME were prescribed and supplied pursuant to a pre-determined, fraudulent protocol pursuant to a kickback or other financial arrangement with No-fault Clinics;

- Unlike legitimate retail DME companies, Yusupov, through Gaogui, and/or those acting under their direction and control, had agreements and/or understandings as to what generic DME and/or orthotic devices would be prescribed by the No-fault Clinics;

- Unlike legitimate retail DME companies, Yusupov, through Gaogui, arranged to have prescriptions for Rental DME delivered to them directly by the No-fault Clinics, rather than allowing the patients to select their own DME retailers; and

- Unlike legitimate retail DME companies, Yusupov, through Gaogui, entered into illicit relationships with the No-fault Clinics, which, in exchange for kickbacks and/or a fee, provided Gaogui with prescriptions and/or referrals for Rental DME pursuant to a predetermined course of treatment, irrespective of medical necessity.

80.    In these and numerous other ways, Defendants sought to deceive Plaintiffs into paying fraudulent claims that typically exceeded several thousands of dollars per Covered Person.

81.    The members of the enterprise alleged herein played well-defined and essential roles in the Defendants' scheme to defraud and in directing the affairs of the enterprises.  By way of example and not limitation, in furtherance of their scheme to defraud, on information and belief, Yusupov engaged in one or more the following:

- Entered into kickback or other financial arrangements with No-fault Clinics, not named as defendants in this action, to ensure that their HCPs prescribed large amounts of virtually identical DME to their patient population;

- Submitted or caused to be submitted, on behalf of Gaogui, numerous fraudulent claim forms seeking payment for Rental DME that was purportedly (but not actually) provided to many Covered Persons;

- Prepared or caused to be prepared fraudulent bills to be mailed to Plaintiffs; and/or

- Mailed or caused those acting under their direction to mail bogus claims to Plaintiffs, knowing that they contained materially false and misleading information.

82.     At all relevant times mentioned herein, Yusupov knew that the prescriptions provided by the No-fault Clinics were fraudulent in that they were issued pursuant to a fraudulent treatment protocol at the No-fault Clinic in connection with an unlawful referral and/or kickback scheme for medically unnecessary Rental DME and accompanying accessories.

83.     At all relevant times mentioned herein, Yusupov, through Gaogui, directly or through others acting under and pursuant to their direction, instruction, and control, submitted or caused to be submitted the fraudulent prescription and/or claim forms, in furtherance of the scheme to defraud alleged herein, to obtain payment in connection with fraudulent claims.

84.     At all relevant times mentioned herein, Yusupov and the No-fault Clinics, acting in concert with each other, participated in, conducted, controlled, conspired together, aided and abetted and furthered the fraudulent schemes through a common course of conduct and purpose, which was to defraud insurers, in general, and Plaintiffs, in particular, of money.

## THE MECHANICS OF THE SCHEME TO DEFRAUD

85.     Beginning in February of 2018, and continuing until the present day, Defendants and others not named in the Complaint have engaged in a systematic fraudulent billing scheme based upon the alleged provision of Rental DME to Covered Persons.

86.     Yusupov formed, owned and/or controlled Gaogui for the purpose of defrauding insurers, in general, and Plaintiffs, in particular.

87.     Gaogui, through Yusupov, engaged in a pervasive scheme to defraud, wherein Yusupov: (i) paid kickbacks to the No-fault Clinics in exchange for prescriptions of Rental DME; (ii) obtained prescriptions that were provided pursuant to a predetermined course of treatment, without regard to medical necessity; (iii) arranged for the No-fault Clinics to have assignments of benefits forms signed by Covered Persons on their behalf to ensure that they had all of the

22

documents necessary to submit claims to insurers, in general, and Plaintiffs, in particular; and (iv) systematically submitted bills to insurers, in general, and Plaintiffs, in particular, for Rental DME and accompanying accessories that were purportedly provided to Covered Persons based on medical necessity when, in fact, Yusupov, through Gaogui, determined the Rental DME that would be prescribed by the No-fault Clinics, with virtually every Covered Person receiving substantially similar Rental DME for a substantially similar timeframe regardless of medical necessity.

88.     Defendants devised and carried out a scheme to fraudulently bill insurers, in general, and Plaintiffs, in particular, for expensive Rental DME that was never provided, or if provided, was provided pursuant to fraudulent prescriptions based upon a pre-determined treatment protocol, irrespective of medical necessity, materially misrepresented in their fraudulent bill submissions to Plaintiffs.

89.     Regardless of whether a Covered Person was seen by a doctor on the date of the initial office visit at any of the unnamed No-fault Clinics operating in the New York metropolitan area, a Covered Person's initial office consultation would automatically trigger a series of internal practices and procedures in which the No-fault Clinics, in exchange for kickbacks and/or other financial compensation agreements, would issue a prescription for a standard battery of DME and/or orthotic devices, pursuant to a standard protocol or predetermined course of treatment and regardless of whether such items were medically necessary, including but not limited to prescriptions for Rental DME.

90.     Such prescriptions are issued for virtually every Covered Person, regardless of factors such as their age, height, weight, prior medical history, position in the vehicle and/or purported involvement in an accident.

91.     As part of the scheme to defraud described herein, pursuant to kickbacks or other financial compensation agreements with Defendants Gaogui and/or Yusupov, the No-fault Clinics arranged for the fraudulent prescriptions to be issued to Gaogui by causing their HCPs to write DME prescriptions in accordance with a pre-determined protocol.

92.     In furtherance of the scheme to defraud alleged herein, the No-fault Clinics did not provide the Covered Persons directly with the prescriptions for Rental DME.  Instead, these prescriptions were given directly to Gaogui to eliminate the possibility that the Covered Person(s) would fill the prescription(s) with a legitimate retailer of Rental DME.

93.     Furthermore, as part of the kickback or other financial compensation agreement with the No-fault Clinics and in furtherance of the scheme to defraud, on their first or second visit to the No-fault Clinic(s), the Covered Persons would be given a number of documents to complete and sign, including, but not limited to, assignment of benefit forms and one or more delivery receipts.

94.     In furtherance of the scheme to defraud and to maximize reimbursement from Plaintiffs, Gaogui routinely deliberately obscured identifying information relating to the billed-for Rental DME so as to prevent Plaintiffs from determining the appropriate charges associated with any such Rental DME or whether the specific Rental DME was medically necessary.

95.     As a matter of pattern, practice, and protocol, Gaogui routinely provided Covered Persons with expensive Rental DME that was medically unnecessary and provided as part of an elaborate kickback scheme for unnecessary referrals to maximize reimbursement.

96.     In furtherance of the predetermined fraudulent protocol of treatment, in numerous instances, the Rental DME prescribed were not documented in the initial examination report or a follow-up examination report of the HCP at the No-fault Clinics where the Covered Persons were

treated.  To the extent that any of the medical records did identify the Rental DME purportedly

prescribed, the records did not explain the medical necessity for the Rental DME, did not identity

or reference all of the Rental DME listed on the prescriptions, and in some instances, identified

Rental DME that was not included on the prescriptions issued by the HCPs.  By way of example

and not limitation:

- On May 21, 2021, Covered Person K.Q., claim no. 0627504269-07, was purportedly seen by the HCP, for an initial examination at a No-fault Clinic located at 9015 Sutphin Boulevard, Jamaica, New York, and thereafter, for a re-evaluation on July 14, 2021, yet neither the initial examination report nor the re-evaluation report mentioned any prescription or recommendation for Rental DME.  Notwithstanding, Gaogui submitted bills with a prescription, dated June 9, 2021, purportedly from the HCP prescribing the following fraudulent equipment.

| Covered Person | Dates of Service | DME Prescribed | Billing Code | Billed Amount |
|---|---|---|---|---|
| K.Q. | 06/10/2021-07/07/2021 | Vascutherm Cold Compression Device | E1399 | $2,156.00 |
| | 06/10/2021 | Delivery and Setup VT5 | A9901 | $152.00 |
| | 06/10/2021 | VT5 Wrap | A9900 | $139.00 |

- On June 7, 2021, Covered Person T.W., claim no. 0629863803-03, was seen for an initial chiropractic examination at a No-fault Clinic located at 92-07 Roosevelt Avenue, First Floor, Jackson Heights, New York, and thereafter for a re-evaluation on October 4, 2021, yet, neither the initial examination report nor the re-evaluation report mentioned any prescription or recommendation for any DME or orthotic devices.  Notwithstanding, Gaogui submitted bills with a prescription dated June 11, 2021 purportedly from the HCP prescribing the following fraudulent equipment:

| Covered Person | Dates of Service | DME Prescribed | Billing Code | Billed Amount |
|---|---|---|---|---|
| T.W. | 06/12/2021-07/09/2021 | Vascutherm Cold Compression Device | E1399 | $2,156.00 |
| | 06/10/2021 | Delivery and Setup VT5 | A9901 | $152.00 |
| | 06/10/2021 | VT5 Wrap | A9900 | $139.00 |

- On May 24, 2021, Covered Person A.S., claim no. 0626932999-01, was purportedly seen for an initial chiropractic examination at a No-fault Clinic located at 87-15 115th Street, First Floor, Richmond Hill, New York yet, neither initial examination report made no mention of any prescription or recommendation for DME or orthotic devices.  Notwithstanding, Gaogui submitted bills with a prescription dated May 24, 2021, purportedly from the HCP prescribing the following fraudulent equipment:

| Covered Person | Dates of Service | DME Prescribed | Billing Code | Billed Amount |
|---|---|---|---|---|
| A.S. | 05/25/2021-06/21/2021 | Vascutherm Cold Compression Device | E1399 | $2,156.00 |
| | 06/10/2021 | Delivery and Setup VT5 | A9901 | $152.00 |
| | 06/10/2021 | VT5 Wrap | A9900 | $139.00 |

- On May 24, 2019, purportedly following a course of treatment at a No-fault clinic located at 200-01 Linden Boulevard, Saint Albans, New York, Covered Person A.A., claim no. 0499800869-01, purportedly underwent an arthroscopic procedure at All Family Healthcare Center (not named a defendant in the Complaint). The medical report from that surgery made no mention of any prescription or recommendation for post-surgical rehabilitative DME and/or orthotic devices.  Notwithstanding, Gaogui submitted a bill with a prescription, dated May 24, 2019, purportedly from the HCP prescribing the following fraudulent equipment.:

| Covered Person | Dates of Service | DME Prescribed | Billing Code | Billed Amount |
|---|---|---|---|---|
| A.A. | 5/25/2019-6/8/2019 | DVT Compression Device | E0676 | $1,455.00 |

- On September 6, 2019, purportedly following a course of treatment at a No-fault clinic located at 132-28 41st Avenue, Flushing, New York, Covered Person C.L., claim no. 0551150766-01, underwent an arthroscopic procedure at New York Surgery Center Queens (not named a defendant in the Complaint). The resulting medical report made no mention of any prescription or recommendation for post-operative rehabilitative rental DME and/or orthotic devices.  Notwithstanding, Gaogui submitted bills with prescriptions, dated September 9, 2019, purportedly from the HCP prescribing the following fraudulent equipment:

| Covered Person | Dates of Service | DME Prescribed | Billing Code | Billed Amount |
|---|---|---|---|---|
| C.L. | 9/7/2019-10/5/2019 | Cold Compression Device | E1399-RR | $2,233.00 |
| | 9/7/2019 | Shoulder Wrap | A9900 | $137.45 |
| | 9/7/2019 | DME Delivery & Setup | A9901 | $155.00 |
| | 9/7/2019-9/5/2019 | CPM Device, Shoulder | E0936 | $2,639.00 |
| | 9/7/2019 | Sheepskin Pad | E0188 | $45.00 |
| | 9/7/2019 | Delivery & Setup | A9901 | $155.00 |

- On September 23, 2019, purportedly following a course of treatment at a No-fault clinic located at 45-22 245th Street, 2nd Floor, Little Neck, New York, Covered Person S.K., claim no. 0551015183-01, purportedly underwent an arthroscopic procedure at Surgicore Surgical Center (not named a defendant in the Complaint).  The resulting medical report made no mention of any prescription or recommendation for a postoperative rehabilitative Compression Devices.  Notwithstanding, Gaogui submitted

bills with a prescription, dated September 23, 2019, purportedly from the HCP prescribing the following fraudulent equipment:

| Covered Person | Dates of Service | DME Prescribed | Billing Code | Billed Amount |
|---|---|---|---|---|
| S.K. | 9/24/2019-10/15/2019 | Cold Compression Device | E1399-RR | $1,694.00 |
| | 9/24/2019-10/8/2019 | DVT Compression Device | E0676 | $1,455.00 |
| | 9/24/2019 | Cold Compression Wrap | A9900 | $137.45 |
| | 9/24/2019 | Delivery and Setup DME | A9901 | $155.00 |

97.     Not surprisingly, a number of the fraudulent prescriptions were issued by medical clinics owned by Dr. Jonathan Landow, M.D., who has been the subject of numerous affirmative fraud recovery actions involving fraudulent services billed to insurance carriers.  *See Government Emp. Ins. Co., et al. v. Landow, M.D., et al.*, 21-cv-01440 (E.D.N.Y.); *Government Emp. Ins. Co., et al. v. Urban Medical, P.C.*, M.D., et al., 18-cv-02956 (E.D.N.Y.); *Travelers Pers. Ins. Co., et al. v. Landow, M.D., et al.*, Index No. 656567/2021 (N.Y. Sup. Ct., N.Y. Cty.).

98.     Defendants' activity promoted and facilitated other acts that imposed costs onto Plaintiffs well beyond the insurance proceeds that Defendants collected, including, but not limited to, Plaintiffs' expenditures for verifying each fraudulent claim through examinations under oath, associated attorneys' and court reporting fees, independent medical examinations ("IMEs"), and peer reviews.

## FRAUDULENT BILLING OF RENTAL DME ITEMS

99.     In furtherance of the scheme to defraud alleged herein, Gaogui, as a matter of pattern, practice, and protocol, routinely provided Covered Persons with expensive Rental DME items that were medically unnecessary and provided, on information and belief, as part of an elaborate kickback scheme for unnecessary referrals in order to maximize reimbursement.

100.    As part of the scheme, the Covered Persons receiving the expensive Rental DME items were involved in minor accidents, suffering soft tissue injuries, to the extent they suffered any injuries at all, that did not require hospitalization and/or extensive medical treatment.  Shortly

after the accident, the Covered Persons are referred for a standard battery of medical treatment from fraudulent "medical mill" multidisciplinary clinics where they are referred for, among other services, physical therapy, chiropractic treatment, acupuncture, and several pieces of DME and/or orthotic devices, including expensive Rental DME—in some instances, receiving up to ten (10) or more items.

101.    At the same time and/or shortly after Covered Persons purportedly receive several pieces of DME and/or orthotic devices, as part of the fraudulent protocol of treatment, the Covered Persons are prescribed a round of expensive pain management Rental DME and/or compression devices by the HCPs operating out of the No-fault Clinics, including the Rental DME billed for and purportedly dispensed by Gaogui.

102.    In sum, Covered Persons purportedly receiving expensive Rental DME from Gaogui Supplies, often receive more than ten (10) standard DME and/or orthotic devices and pain management rental DME, all prescribed by the same HCP and/or No-fault Clinics operating out of the same location, in some cases exceeding $10,000.00 in total costs for the items. By way of example but not limitation:

- In connection with claims submitted on behalf of Covered Person C.B., claim number 0555478956-01, Plaintiffs were billed for at least fourteen pieces of regular DME, totaling $3,150.70, all prescribed by HCPs operating out of the same location. On July 28, 2019, Sabas NY Services Co (not named as a defendant in the Complaint) purportedly provided a cervical traction unit and back brace, for a total of $1,346.76. Two days later, on July 30, 2019, Medical Supply Depot Group (not named as a defendant in the Complaint) purportedly provided a cervical collar, cervical pillow, back brace, electric heat pad, back cushion, car seat, egg crate mattress and bed board, for a total of $881.69. On August 28, 2019, Medical Supply Depot Group also purportedly provided a transcutaneous electrical nerve stimulator ("TENS") device with placement belt, heat lamp with stand, massager, and hydrotherapy whirlpool, for a total of $922.25. Contemporaneously with the Covered Person's purported receipt of the aforementioned standard DME, starting August 8, 2019, BodyBloom Services Inc (not named as a defendant in the Complaint) purportedly

provided a sustained acoustic medicine ("SAM") unit, for a thirty-two-day period, for a total of $2,762.34. Thereafter, on September 24, 2019, Defendant Gaogui purportedly provided a Vascutherm Cold Compression Device with an accompanying wrap for a twenty-eight-day rental period, for a total of $2,525.45. Ultimately, Plaintiffs were billed $7,091.73 in connection with at least fifteen pieces of DME, all prescribed by HCPs operating out of the same location.

- In connection with claims submitted on behalf of Covered Person K.Q., claim number 0627504269-07, Plaintiffs were billed for at least seventeen pieces of regular DME, totaling $5,185.63, all prescribed by the same HCP. On May 26, 2021, A to Z Supply Services Inc (not named as a defendant in the Complaint) purportedly provided cervical pillow, car seat, lumbar cushion, egg crate mattress, bed board, TENS device with belt, massager, infrared heating lamp, hydrotherapy whirlpool and two back braces, for a total of $2,034.95. On June 16, 2021, Aniger Supply Inc (not named as a defendant in the Complaint) purportedly provided a cervical traction unit and a third back brace for a total of $1,361.76, and on July 23, 2021, purportedly provided a shoulder brace for $911.92. Thereafter, on August 16, 2021, A to Z Supply Services Inc also purportedly provided a second transcutaneous TENS device with belt, second massager and second infrared heating lamp, for a total of $877.00. Contemporaneously with the Covered Person's purported receipt of the aforementioned standard DME, starting June 10, 2021, Defendant Gaogui purportedly provided a Vascutherm Cold Compression Device along with an accompanying wrap for a twenty-eight-day rental period, for a total of $2,447.00. Thereafter, on July 21, 2021, Orthopain Supply (not named as a defendant in the Complaint) purportedly provided an OrthoCor Active System cervical device, along with accompanying pods, for a thirty-day rental period, for a total of $6,075.00. Ultimately, Plaintiffs were billed $13,707.63 in connection with at least nineteen pieces of DME, all prescribed by HCPs operating out of the same location.

- In connection with claims submitted on behalf of Covered Person D.W., claim number 0614827343-01, Plaintiffs were billed for at least ten pieces of regular DME, totaling $3,161.91, all prescribed by HCPs operating out of the same location. On February 10, 2021, Agasaky Multi Services Inc (not named as a defendant in the Complaint) purportedly provided a water circulating hot/cold unit, infrared heat lamp, massager, back brace, cervical collar, egg crate mattress and bed board, for a total of $1,414.59. On March 13, 2021, Agasaky Multi Services Inc also purportedly provided a cervical traction unit with pump and additional supplies, and a back brace, for a total of $1,391.76. On October 17, 2021, Drak Medical Equipment Inc (not named as a defendant in the Complaint) purportedly provided a massager, for $355.56. Contemporaneously with the Covered Person's purported receipt of the aforementioned standard DME, starting June 3, 2021, Surgut Leasing Corp (not named as a defendant in the Complaint) purportedly

provided a Vascutherm cold compression device, along with an accompanying wrap, for a twenty-eight-day rental period, for a total of $2,478.50. Eight days later, on June 11, 2021, Defendant Gaogui purportedly provided a second Vascutherm Cold Compression Device for an additional twenty-eight-day rental period, for a total of $2,447.00. Thereafter, on June 16, 2021, SMS Therapy Supply Inc (not named as a defendant in the Complaint) purportedly provided a SAM unit for a forty-two-day rental period, for a total of $2,964.00. On June 23, 2021, Get Well Supply Inc (not named as a defendant in the Complaint) purportedly provided an OrthoCor Active System lumbar device for a thirty-day period, for a total of $6,075.00. Ultimately, Plaintiffs were billed $13,707.63 in connection with at least nineteen pieces of DME, all prescribed by No-fault Clinics operating out of the same location.

103.    Moreover, months after the accident, as part of the fraudulent protocol of treatment, many of the Covered Persons are eventually referred for arthroscopic surgery at ambulatory surgical centers ("ASCs") throughout New York and New Jersey. These surgical procedures are performed on an outpatient basis, not requiring an overnight hospital stay, and, in many cases, are not medically necessary.

104.    On the same day as the surgery, and within a few short days after the surgery, the Covered Persons are prescribed additional expensive perioperative and/or postoperative rental DME and/or compression devices as part of a pattern and protocol of treatment to maximize reimbursement for items that were not medically necessary and/or were provided pursuant to a kickback arrangement or for other financial consideration. In many cases, between the pain management Rental DME prescribed out of the No-Fault Clinics and the perioperative and/or postoperative rental DME and/or compression devices prescribed after the referral to an ASC, Covered Persons receive at least three or more pieces of rental DME and/or compression devices, for up to 28 days or longer, in some cases exceeding $7,000.00 in a total cost for all of the rental DME and/or compression devices prescribed for the Covered Person. By way of example and not limitation, the following Covered Persons received the same or similar battery of rental DME and/or compression devices:

- In connection with claims submitted on behalf of Covered Person F.E., claim number 0535044838-01, Plaintiffs were billed for at least four pieces of rental DME and/or compression devices and related appliances purportedly provided by three different companies, for a total of $6,499.45. On April 3, 2019, the day the Covered Person underwent an arthroscopic surgical procedure at an ASC, Unicast Inc (not named a defendant in the Complaint) purportedly provided a Prothermo cold compression device and accompanying appliance, for a single day rental for use at the ASC, for $283.00 and $54.00, respectively. Starting one day later, on April 4, 2019, Defendant Gaogui purportedly provided a Vascutherm Cold Compression Device and CPM Device, each for a twenty-one-day rental period, for a total of $3,621.45.  Starting approximately two weeks later on April 21, 2019, ALM Care Supply Inc. (not named as a defendant in the Complaint) purportedly provided a SAM unit for a forty-two-day period, for a total of $2,541.00.

- In connection with claims submitted on behalf of Covered Person J.Y., claim number 0487188682-01, Plaintiffs were billed for at least three pieces of rental DME and/or compression devices and related appliances purportedly provided by two different companies, amounting to $7,299.66. Starting March 8, 2018, one day after the Covered Person underwent an arthroscopic surgical procedure at an ASC, Defendant Gaogui purportedly provided a Cold Compression Device for a fourteen-day period, for a total of $841.66.  Starting five days later, on March 13, 2018, Defendant Gaogui purportedly provided a CPM Device for a forty-two-day rental period, for a total of $4,022.00.  Starting one day later, on March 14, 2018, Nu Age Med Solutions Inc (not named as a defendant in the Complaint) purportedly provided a SAM unit for a fourth-two-day period, for a total of $2,436.00.

- In connection with claims submitted on behalf of Covered Person H.M., claim number 0549020170-01, Plaintiffs were billed for at least three pieces of rental DME and/or compression devices and related appliances purportedly provided by three different companies amounting to $4,656.50. Starting July 27, 2019, one day after the Covered Person underwent an arthroscopic surgical procedure at an ASC, Defendant Gaogui purportedly provided a Compression Device for a fifteen-day rental period, for a total of $1,455.00.  Starting one day later, on July 29, 2019, NYC Best Medical Supply Inc (not named a defendant in the Complaint) purportedly provided a cold compression electric pump, along with an accompanying wrap, for a twenty-eight-day period, for a total of $2,039.50.  Starting approximately two weeks later, on August 12, 2019, MultiMed Supply Inc (not named a defendant in the Complaint) purportedly provided a continuous passive motion device for the knee for a fourteen-day period, for a total of $1,162.00.

105.    Such devices are medically unnecessary, and far less expensive and intrusive courses of treatment, such as the provision of inexpensive cold packs, would provide the same if not better treatment than the complex devices provided by the Retail Defendants.  In that regard, the supply of such items was motivated by money, without regard to the actual need of the patients, for the express purpose of increasing the amount of reimbursement sought from insurers in general, and Plaintiffs in particular.

1.    **Fraudulent Billing for DVT Compression Devices and Cold Compression Devices**

106.    In furtherance of the scheme to defraud alleged herein, Yusupov, through Gaogui, routinely submitted bills to Plaintiffs for Vascutherm compression devices ("Cold Compression Devices") and deep vein thrombosis devices ("DVT Compression Devices") that were not provided as billed, supplied pursuant to a fraudulent protocol of treatment, medically unnecessary and/or never provided.

107.    Each of the Covered Persons that received Cold Compression Devices and DVT Compression Devices were involved in minor impact accidents and suffered only soft-tissue injuries, to the extent they suffered any injuries at all.  By way of example and not limitation, in connection with claim numbers 0535044828-01, 0549020170-01, 0549020170-01, 0551015183-01, 0551150766-01, 0555478956-01, 0618213110-02 and 05969794762-03, none of the Covered Persons were involved in major car accidents that resulted in significant injury or hospitalization.

108.    Shortly after the accident, each of the Covered Persons visited multidisciplinary No-fault Clinics that, in exchange for kickbacks and/or other financial compensation, referred the Covered Persons for a standard battery of treatment that included, but is not limited to, referrals for physical therapy, chiropractic treatment, acupuncture, electrodiagnostic testing and basic DME.  As part of the aforementioned treatment protocol, contemporaneous with or a short

time after Covered Persons are prescribed basic DME, Covered Persons are also prescribed the

Cold Compression Devices, DVT Compression Devices and/or CPM Devices on a rental basis

for the purposes of pain management that Defendants purportedly provided to Covered Persons.

Indeed, in addition to receiving a substantial and similar battery of regular and rental pain

management DME, including a Cold Compression Device and/or DVT Compression Device

purportedly provided by Gaogui with respect to DME, pursuant to a fraudulent protocol

established by the No-fault Clinics that issue the fraudulent prescriptions, Covered Persons

receive one or more additional compression devices and other rental DME the same day as or

shortly after undergoing medically unnecessary arthroscopic surgeries at ASCs.  By way of

example and not limitation below are non-exhaustive examples of the extreme volume of regular

and rental DME provided to patients pursuant to a fraudulent treatment protocol for which the

DME Retailers paid kickbacks and/or other financial compensation for the referral from the No-

fault Clinics:

- In connection with claims submitted on behalf of Covered Person C.B., claim number 0555478956-01, Plaintiffs were billed for at least fourteen pieces of regular DME, totaling $3,150.70. On July 28, 2019, Sabas NY Services Co (not named as a defendant in the Complaint) purportedly provided two pieces of non-rental DME, consisting of a cervical traction unit and back brace, for a total of $1,346.76.  Two days later, on July 30, 2019, Medical Supply Depot Group (not named as a defendant in the Complaint) purportedly provided eight pieces of non-rental DME, consisting of a cervical collar, cervical pillow, back brace, electric heat pad, back cushion, car seat, egg crate mattress and bed board, for a total of $881.69.  Thereafter, on August 28, 2019, Medical Supply Depot Group (not named as a defendant in the Complaint) purportedly provided four more pieces of non-rental DME, consisting of a transcutaneous electrical nerve stimulator ("TENS") device with placement belt, heat lamp with stand, massager and hydrotherapy whirlpool, for a total of $922.25. Contemporaneously with the Covered Person's purported receipt of the aforementioned standard DME, starting August 8, 2019, BodyBloom Services Inc (not named as a defendant in the Complaint) purportedly provided a sustained acoustic medicine ("SAM") unit, for a thirty-two-day period, for a total of $2,762.34. Thereafter, on September 24, 2019,

Defendant Gaogui purportedly provided a Vascutherm Cold Compression Device with an accompanying wrap for a twenty-eight-day rental period, for a total of $2,525.45. Starting October 23, 2019, iSurply LLC (not named as a defendant in the Complaint) purportedly provided a Game Ready Compression Unit with accompanying garment for a twenty-one-day period, for a total of $1,680.00. Ultimately, Plaintiffs were billed $8,771.73 in connection with at least fifteen pieces of DME.

- In connection with claims submitted on behalf of Covered Person P.S., claim number 0618213110-02, Plaintiffs were billed for at least seventeen pieces of regular DME, totaling $5,701.50.  On March 17, 2021, Agasaky Multi Services Inc (not named as a defendant in the Complaint) purportedly provided a back brace, lumbar cushion, cervical collar, heating pad, dry pressure mattress, orthopedic pillow, bed board, cold and hot pack, water circulating hot/cold unit, and massager, for a total of $1,535.36.  Ten days later, on March 27, 2021, Agasaky Multi Services Inc purportedly provided a second back brace and a cervical traction unit with pump, for a total of $1,354.27.  Thereafter, on April 16, 2021, Agasaky Multi Services Inc purportedly provided an infrared heat lamp, whirlpool, and TENS unit with placement belt, for a total of $792.25.  Starting on June 18, 2021, Defendant Gaogui purportedly provided a Cold Compression Device, DVT Compression Device and CPM Device, each for a twenty-eight-day period, for a total of $7,347.00.  Starting on August 20, 2021, Trebor Multi Services Inc (not named as a defendant in the Complaint) purportedly provided a Vascutherm cold compression device for a twenty-eight-day rental period, for a total of $2,447.00.  Starting approximately two weeks later, on September 4, 2021, Trebor Multi Services Inc purportedly provided a continuous passive motion device for a twenty-eight-day rental period, for a total of $2,632.00.  Thereafter, on February 10, 2022, Paragas Multi Services Inc (not named as a defendant in the Complaint) purportedly provided a knee brace and a shoulder brace, for a total of $2,019.62.  On April 11, 2022, Global Provider Services (not named as a defendant in the Complaint) purportedly provided a second continuous passive motion device, along with a synthetic sheepskin pad, and a cold compression unit, each for a fourteen-day period, for a total of $2,581.27.  Ultimately, Plaintiffs were billed $20,708.77 in connection with at least twenty-four pieces of DME.

- In connection with claims submitted on behalf of Covered Person D.W., claim number 0614827343-01, Plaintiffs were billed for at least ten pieces of regular DME, totaling $3,161.91. On February 10, 2021, Agasaky Multi Services Inc (not named as a defendant in the Complaint) purportedly provided seven pieces of non-rental DME, along with related accessories, consisting of a water circulating hot/cold unit, infrared heat lamp, massager, back brace, cervical collar, egg crate mattress and bed board, for a total of $1,414.59.  On March 13, 2021, Agasaky Multi Services Inc purportedly provided two additional pieces of non-rental DME consisting of a cervical

traction unit with pump and additional supplies, and a back brace, for a total of $1,391.76.  Starting June 3, 2021, Surgut Leasing Corp (not named as a defendant in the Complaint) purportedly provided a Vascutherm cold compression device, along with an accompanying wrap, for a twenty-eight-day rental period, for a total of $2,478.50.  Eight days later, on June 11, 2021, Defendant Gaogui purportedly provided a second Vascutherm Cold Compression Device for an additional twenty-eight-day rental period, for a total of $2,447.00. Thereafter, on June 16, 2021, SMS Therapy Supply Inc (not named as a defendant in the Complaint) purportedly provided a SAM unit for a forty-two-day rental period, for a total of $2,964.00, and on June 23, 2021, Get Well Supply Inc (not named as a defendant in the Complaint) purportedly provided an OrthoCor Active System lumbar device for a thirty-day period, for a total of $6,075.00. Thereafter, on October 17, 2021, Drak Medical Equipment Inc (not named as a defendant in the Complaint) purportedly provided an additional non-rental DME item, consisting of a massager, for a total of $355.56.  Contemporaneously with the Covered Person's purported receipt of the aforementioned standard DME, Ultimately, Plaintiffs were billed $13,707.63 in connection with at least nineteen pieces of DME.

109.    A DVT Compression Device consists of an air pump and an inflatable jacket that encloses the limb requiring treatment. The pump fills the jacket with compressed air to predetermined pressures and intermittently alternates inflation and deflation to preset cycle times. A Cold Compression Device, which was also billed for by Defendants, operates similarly but simultaneously applies cold and/or heat therapy to the affected area of the patient.  As indicated in the prescriptions issued by the HCPs at the Clinics, the compression devices were mainly issued and to be used for cold compression therapy.

110.    Cold Compression Devices and DVT Compression Devices are used to improve venous circulation in the limbs of a patient suffering from edema, or the risk of deep vein thrombosis (DVT) or pulmonary embolism. The primary purpose of the device is to ensure movement of venous blood by pressurizing the tissues in the limb, thereby forcing fluids, such as blood and lymph out of the pressurized area. The pressure is later reduced, allowing for increased blood flow back into the limb.

111.    The standard of care in the prevention of DVT is anticoagulation medication unless it is contraindicated. However, the DVT Compression Devices dispensed by Gaogui were dispensed irrespective of whether or not anticoagulation medication was contraindicated for a given patient, pursuant to a fraudulent predetermined treatment protocol.

112.    Moreover, the Cold Compression Devices purportedly dispensed by Gaogui were not dispensed following a surgery to prevent DVT, but were purportedly provided for pain management and/or to reduce swelling and inflammation related to soft-tissue injuries caused by a motor vehicle accident.

113.    On information and belief, no legitimate physician would issue a prescription for a Cold Compression Device to a patient following a motor vehicle accident when the patient is able to use an ice pack and compression bandage to address swelling and inflammation.

114.    On information and belief, no legitimate physician would issue a prescription for a Cold Compression Device to a patient following a motor vehicle accident for use more than a week following the accident, long after the period when cold therapy and compression, would decrease swelling from the trauma caused by a low-impact automobile accident.

115.    Notwithstanding the foregoing, the Cold Compression Devices that Gaogui purportedly provided to Covered Persons were prescribed by HCPs for use by Covered Persons a week or more following the date of their low-impact automobile accidents, and on information and belief, to patients who were able to use ice packs and compression bandages to address swelling and inflammation.

116.    The Cold Compression Devices and DVT Compression Devices supplied by Gaogui were dispensed pursuant to protocol of treatment, without regard to medical necessity as

part of an elaborate scheme to supply insureds with excessive and unnecessary rental DME, in excessive amounts beyond what it was entitled to be reimbursed under the No-fault Law, in order to maximize reimbursement and exploit the payment formulas under the applicable Fee Schedule.

117.   In that regard, Gaogui routinely billed Plaintiffs for Cold Compression Devices at a rate of $77.00 per day under Code E1399, an HCPCS Code recognized under the Fee Schedule without a listed maximum reimbursement amount.

118.   On information and belief, Gaogui's acquisition cost for the Cold Compression Devices was approximately $2,500.00 per device, the amount that the Cold Compression Devices are available for sale to the general public.

119.   On information and belief, the maximum monthly rental rate that Gaogui was permitted to charge for the rental of Cold Compression Devices, thus, was no more than $250.00.

120.   However, Gaogui routinely billed Plaintiffs $2,156.00 for a twenty-eight-day rental for Cold Compression Devices, more than eight (8) times the maximum permissible monthly rental rate for the Cold Compression Devices Gaogui purportedly provided.

121.   Moreover, after the initial round of unnecessary treatment, upon a follow up visit with the No-fault Clinics, in most cases, the patients are referred for surgical procedures performed at ambulatory surgical centers ("ASCs") throughout New York and New Jersey.

122.   After the surgery at the ASC, the Covered Persons are purportedly provided with Compression Devices post-surgery, along with several other pieces of rental DME.

123.   The use of DVT Compression Devices is rarely indicated in the types of procedures performed on the Covered Person to prevent limb edema.  In almost all cases, the prevention and/or alleviation of post-surgical edema can be done simply by using simple cold packs, compressive bandages, and elevation of the limb.

124. The DVT Compression Devices supplied by Gaogui were dispensed pursuant to protocol of treatment, without regard to medical necessity as part of an elaborate scheme to supply insureds with excessive and unnecessary rental DME, in excessive amounts beyond what it was entitled to be reimbursed under the No-fault Law, in order to maximize reimbursement and exploit the payment formulas under the applicable Fee Schedule.

125. By way of example and not limitation, Exhibit "3" in the accompanying Compendium of Exhibits is a representative sample of claims where Gaogui submitted fraudulent bills to Plaintiffs for DVT Compression Devices billed under code E0676 at a daily rental rate of $77.00 to $97.00, for total amounts up to  in the amount of $2,632.00, purportedly provided on the same day or shortly after the patient underwent an arthroscopic procedure at an ASC. By way of further example and not limitation, Exhibit "4" in the accompanying Compendium of Exhibits is a representative sample of claims where Gaogui submitted fraudulent bills to Plaintiffs for Cold Compression Devices billed under code E1399 at a daily rental rate of $77.00, for total amounts up to $2,156.00 for a twenty-eight-day rental period, along with accompanying wraps, each for $139.00 and billed under code A9900, delivery and setup, billed under code A9901 for $152.00, and additional supplies, materials and clinical staff time billed under code 99072 for $50.00.

## 2. Fraudulent Billing for Continuous Passive Motion Machines

126. In furtherance of the scheme to defraud alleged herein, Yusupov, through Gaogui, routinely submitted bills to Plaintiffs for Continuous Passive Motion ("CPM") devices that were not provided as billed, supplied pursuant to a fraudulent protocol of treatment, medically unnecessary and/or never provided.

127. As a matter of pattern, practice, and protocol, Yusupov, through Gaogui, submitted to Plaintiffs prescription forms which they knew or should have known to be fabricated and/or

fraudulently altered, in order to misrepresent that CPM devices were medically necessary, when in fact, the CPM devices were provided, if at all, to financially enrich Yusupov through a fraudulent protocol of treatment.

128.    CPM is a modality of post-surgical treatment in which joint motion is provided by a machine without active contraction of muscle groups. A CPM device allows passive movement to be performed to a joint for hours at a time. The theory behind CPM is that recovery will be accelerated by decreasing soft tissue stiffness, increasing range of motion, and promoting healing of joint surfaces in soft tissues, and preventing the development of adhesions. A typical CPM device consists of a carriage for support of the extremity and a controller that is programmed to passively flex and extend the joint through a set range of motion, speed, pause and duration.

129.    CPM devices have no medical utility in limited post-operative circumstances, such as total knee replacements, and other knee indications including rehabilitation following repair of an anterior cruciate ligament prior to active physical therapy.

130.    CPM is not medically useful as a treatment following basic arthroscopic surgical procedures, does not provide any long-term benefit to post-operative management of patients, is no more effective than standard physical therapy and is not supported by the medical literature:

- A systematic review of rehabilitation methods after arthroscopic rotator cuff repair was done by Anthony Yi, et al., and published in the journal *Sports Health* in 2015 (7:326-334), which concluded that it is unknown whether CPM offers any benefit after shoulder surgery. In addition, research has shown that CPM does not have any advantage for patients having knee surgery. For example, in patients having a total knee replacement, the American Association of Orthopedic Surgery (AAOS) has a Guideline that states: "Strong evidence supports that CPM after knee arthroplasty does not improve outcomes."

- A Cochrane Review was published that involved an analysis of multiple articles, and their conclusion was: *CPM does not have clinically important*

*effects on active knee flexion ROM, pain, function, or quality of life to justify its routine use.* In addition, in a study by Herbold, et al., a matched cohort of patients with total knee replacement were compared, and their conclusion was: *The outcome variables of 61 matched pairs of CPM users and non-CPM users were reported. No statistically significant differences were found in any of the outcomes.*

- A study published in the July 1998 Journal of Bone and Joint Surgery comparing the results of 31 patients randomly assigned CPM therapy or manual passive range of motion exercises for post-operative management of rotator cuff repair, found no significant differences in Shoulder Pain and Disability index scoring for pain and functional disability of each group, and no significant differences between the two groups with regard to the range of motion or strength.

- A study published in the July 16, 2014 Journal of Bone and Joint Surgery comparing the results of 40 patients post treatment of intra-articular knee fractures around the knee, randomly assigned CPM or standardized physical therapy for 48 hours immediately following surgery, found that CPM significantly improved knee flexion in the first 48 hours. However, there was no significant difference in knee pain at 48 hours, no other knee flexion or extension detected at any other time and no benefit of CPM in the immediate post-operative period with regard to knee motion at six months.

131.    In addition to these studies, the Centers for Medicare and Medicaid Services ("CMS") issued a National Coverage Determination concluding that CPMs are only necessary after total knee arthroplasty, anterior cruciate ligament repair or reconstruction, after cartilage grafting procedures during the non-weight-bearing period to promote healing, and surgical release of arthrofibrosis of any joint.

132.    CMS also stated that CPMs should be provided within 48 hours after surgery and that there is insufficient evidence to justify the use of CPMs beyond 21 days.

133.    Notwithstanding that CPM devices are not medically useful as a treatment following routine knee and shoulder arthroscopic surgical procedures such as those performed on Covered Persons, Yusupov, through Gaogui, and pursuant to illicit kickback agreements with

the HCPs, filled needless prescriptions for CPM devices to Covered Persons who purportedly underwent such procedures.

134.    Notwithstanding the lack of medical literature supporting the use and/or provision of CPM devices for patients that undergo routine arthroscopic procedures, as a matter of pattern, practice and protocol, such devices were routinely prescribed to Covered Persons and supplied by Gaogui pursuant to a pre-determined protocol of treatment and fraudulent scheme to maximize reimbursement.

135.    Despite the fact that CPMs are not medically necessary for the injuries suffered by most, if not all the Covered Persons, and the lack of sufficient evidence to justify their use beyond 21 days, Gaogui routinely filled prescriptions systematically provided by the HCPs for CPMs to be used for approximately 4 weeks.

136.    Although CPM units can be purchased from legitimate companies for less than Gaogui's accumulated monthly charges for the particular items, Gaogui systematically represented that the inexpensive CPMs dispensed to Covered Persons are high-quality and expensive units by submitting monthly charges that far exceed the true value of the products.

137.    Specifically, Yusupov, through Gaogui, routinely submitted bills to Plaintiffs for the rental of CPM devices for use on joints other than the knee at rates ranging from approximately $87.00 to $91.00 per day per patient, using billing code E0936, resulting in total charges in amounts ranging from $910.00 to $3,913.00 per patient.

138.    In addition, Yusupov, through Gaogui, routinely submitted bills to Plaintiffs for the rental of CPM devices for use on the knee at rates ranging from $72.00 to $74.00 per day, using billing code E0935, resulting in total charges in amounts ranging from $864.00 to $7,776.00 per patient.

139.    Notwithstanding that the Medicare rate for a CPM is only $21.50 per day, and the WCB DME Fee Schedule rates for Knee CPMs and CPMs for other limbs are the equivalent of only $18.88 per day and $31.19 per day, respectively, the charges by Gaogui far exceed that rate and are grossly inflated in order to maximize their reimbursement in furtherance of the scheme to defraud.

140.    By way of example and not limitation, Exhibit "5" in the accompanying Compendium of Exhibits is a spreadsheet containing a representative sample of claims wherein Retail Defendants submitted fraudulent bills for the rental of CPM Devices to Plaintiffs using billing codes E0935 and/or E0936, with accompanying pads billed under code E0188 and delivery fees billed under code A9901.

<u>**DISCOVERY OF THE FRAUD**</u>

141.    To induce Plaintiffs to promptly reimburse their claims for Rental DME, Defendants have gone to great lengths to systematically conceal their fraud.  By way of example and not limitation:

- Yusupov, through Gaogui, routinely and deliberately submitted claims for reimbursement that were based on a pre-determined protocol of treatment without regard for medical necessity;

- Yusupov, through Gaogui, routinely and deliberately concealed that its No-fault claims were submitted pursuant to an unlawful referral, illicit kickback and/or other financial compensation arrangement between and among one or more of the Defendants and the No-fault Clinics in order to maximize reimbursement;

- Yusupov, through Gaogui, knowingly misrepresented and concealed that Gaogui's claims for reimbursement were based on a pre-determined protocol of treatment without regard for medical necessity and were submitted pursuant to an unlawful referral, illicit kickback and/or other financial compensation arrangement between and among one or more of the Defendants and the No-fault Clinics in order to maximize reimbursement; and/or

- Yusupov, through Gaogui, knowingly and deliberately concealed the amounts Gaogui was entitled to be reimbursed in the bills submitted to

Plaintiffs by misrepresenting the codes and reimbursement amounts as part of the scheme to manipulate the payment formulas under the applicable DME Fee Schedule in order to maximize the charges that they could submit to Plaintiffs and other insurers.

142.    Plaintiffs are under a statutory and contractual obligation to promptly and fairly process claims within 30 days. The documents submitted to Plaintiffs in support of the fraudulent claims at issue, combined with the material misrepresentations, omissions and acts of fraudulent concealment described above, were designed to, and did cause Plaintiffs to justifiably rely on them. As a proximate result, Plaintiffs have incurred damages of more than $283,000.00 based upon the fraudulent bill submissions.

143.    Based upon Defendants' material misrepresentations and other affirmative acts to conceal their fraud from Plaintiffs, Plaintiffs did not discover and should not have reasonably discovered that their damages were attributable to fraud until shortly before they filed this Complaint.

## FIRST CLAIM FOR RELIEF

## AGAINST DEFENDANT YUSUPOV, ABC CORPORATIONS 1 THROUGH 5 AND JOHN DOES 1 THROUGH 5

### (RICO, pursuant to 18 U.S.C. § 1962(c))

144.    The allegations of paragraphs 1 through 143 are hereby repeated and re-alleged as though fully set forth herein.

## THE RICO ENTERPRISE

145.    At all times relevant herein, Defendant Gaogui Leasing Corp. was an "enterprise" engaged in, or the activities of which affected, interstate commerce, as that term is defined by 18 U.S.C. § 1961(4), and within the meaning of 18 U.S.C. § 1962(c).

146.    From on or about February 2, 2018 through the date of the filing of this Complaint, Defendants Yusupov, one or more of the ABC Corporations 1 through 5, and one or more of the

John Does 1 through 5, knowingly conducted and participated in the affairs of the Gaogui enterprise through a pattern of racketeering activity, including the numerous acts of mail fraud described herein and included in the representative list of predicate acts set forth in the Appendix and Compendium of Exhibits accompanying this Complaint, all of which are incorporated by reference. Defendants' conduct constitutes a violation of 18 U.S.C. § 1962(c).

147.    At all relevant times mentioned herein, Defendant Yusupov, together with others unknown to Plaintiffs, exerted control over and directed the operations of the Gaogui enterprise and utilized that control to conduct the pattern of racketeering activities that consisted of creating, submitting and/or causing to be submitted the fraudulent bills and supporting documents to Plaintiffs that were based, in part, on the utilization of fraudulent prescriptions.

148.    One or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5 participated in the scheme by providing DME pursuant to a predetermined course of treatment, irrespective of medical necessity, based on illicit kickback and/or other financial compensation agreements between and among one or more of the Defendants and the No-fault Clinics, as well as bogus documentation, that grossly inflated the purported cost and/or necessity of the DME to facilitate the fraudulent billing alleged in the Complaint.  One or more of the ABC Corporations furnished documents that Defendant Yusupov required, in furtherance of the scheme to defraud, to obtain payment from Plaintiffs for fraudulent DME claims.

149.    It was both foreseeable and the intended consequence of the illicit kickback and/or other financial compensation agreements between and among one or more of the Defendants and the No-fault Clinics, that the bogus documentation provided by one or more of the John Does 1 through 5, through one or more of the ABC Corporations 1 through 5, would be mailed to substantiate fraudulent claims and to induce payment from Plaintiffs.

**The Pattern of Racketeering Activity**
**(Racketeering Acts)**

150.    The racketeering acts set forth herein were carried out on a continued basis for more than a five-year period, were related and similar and were committed as part of the ongoing scheme of Defendant Yusupov, one or more of the ABC Corporations 1 through 5, and one or more of the John Does 1 through 5 to fraudulently bill for DME to defraud insurers, and, if not stopped, such acts will continue into the future.

151.    This pattern of racketeering activity poses a specific threat of repetition extending indefinitely into the future, in as much as Gaogui continues to pursue collection on the fraudulent billing to the present day.

152.    As a part of the pattern of racketeering activity and for the purpose of executing the scheme and artifice to defraud as described above, Defendant Yusupov, with the knowledge and intent of one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5, caused mailings to be made through the United States Postal Service in violation of 18 U.S.C. § 1341. The mailings were made in furtherance of a scheme or artifice to defraud Plaintiffs and to induce Plaintiffs to issue checks to the Gaogui enterprise based upon materially false and misleading information.

153.    Through the Gaogui enterprise, Defendant Yusupov submitted numerous fraudulent claim forms seeking payment for DME that was purportedly (but not actually) provided to numerous Covered Persons as billed. The bills and supporting documents that were sent by Yusupov, as well as the payments that Plaintiffs made in response to those bills, were sent through the United States Postal Service. By virtue of those activities, Defendants Yusupov, one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5 engaged in a

continuous series of predicate acts of mail fraud, extending from the formation of the Gaogui enterprise through the filing of this Complaint.

154.    A representative sample of predicate acts is set forth in the accompanying Appendix, which identifies the nature and date of mailings that were made by Defendant Yusupov in furtherance of the scheme as well as the specific misrepresentations identified for each of the mailings.

155.    Mail fraud constitutes racketeering activity as that term is defined in 18 U.S.C. § 1961(1)(B).

156.    Each submission of a fraudulent claim constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

**Damages**

157.    By reason of the foregoing violation of 18 U.S.C. § 1962(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company have been injured in their business and property and have been damaged in the aggregate amount presently in excess of $280,000.00, the exact amount to be determined at trial.

158.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance Company, and Allstate Property and Casualty Insurance Company are entitled to recover from Defendants Yusupov, one or more of the ABC Corporations 1 through 5 and one or more of the John Does 1 through 5, jointly and severally, three-fold damages sustained by it, together with the costs of this lawsuit and reasonable attorneys' fees.

**SECOND CLAIM FOR RELIEF**

**AGAINST DEFENDANTS GAOGUI AND YUSUPOV**

**(Common Law Fraud)**

159.    The allegations of paragraphs 1 through 143 are hereby repeated and realleged as though fully set forth herein.

160.    Defendants Gaogui and Yusupov made material misrepresentations and/or omitted material statements in submitting No-fault claims to Plaintiffs for payment.

161.    Each and every bill and supporting documentation submitted by Defendants Gaogui and Yusupov to Plaintiffs set forth false and fraudulent amounts for reimbursement for DME that they purportedly supplied to Covered Persons. The false representations contained therein not only were intended to defraud Plaintiffs but constitute a grave and serious danger to the Covered Persons and the consumer public.

162.    Defendants Gaogui and Yusupov intentionally, knowingly, fraudulently and with an intent to deceive, submitted bills, prescriptions, wholesale invoices and other documentation that contained false representations of material facts, including, but not limited to, the following fraudulent material misrepresentations and/or omissions of fact:

- False and misleading statements as to the nature, quality, and cost of the DME purportedly supplied to Covered Persons;

- False and misleading statements as to the amounts Gaogui was entitled to be reimbursed under the No-fault Law;

- With respect to rented DME, false and misleading statements that the items were (a) medically necessary when the items were the product of a predetermined protocol of treatment, designed to maximize the reimbursement in furtherance of a scheme to defraud without regard to the actual medical needs of the Covered Persons; (b) not billed in excess of the maximum permissible monthly rental charge or maximum accumulated rental charge for such equipment, supplies and services provided on a rental basis under the applicable Fee Schedule; and/or (c) not billed in excess of the lower of the monthly rental charge to the general public or the price

47

determined by the New York State Department of Health area office if no maximum monthly rental rate is provided in the applicable Fee Schedule;

- False and misleading prescriptions for the DME purportedly supplied to Covered Persons, generically describing the item to conceal the type of item being prescribed; and/or

- False and misleading prescriptions for DME, concealing the fact that the (a) DME was prescribed and supplied pursuant to a pre-determined, fraudulent protocol whereby Defendant Yusupov, through Gaogui, paid kickbacks to No-fault Clinics to induce the No-fault Clinics to direct their associated physicians and chiropractors to prescribe large amounts of substantially similar, medically unnecessary DME; (b) DME was not covered by the applicable DME Fee Schedule; and (c) DME was generically described on the prescriptions, all of which was designed to permit Defendant Yusupov, through Gaogui, to manipulate the payment formulas and their claims submissions in order to maximize the charges that they could submit to Plaintiffs and other insurers.

163.    The foregoing was intended to deceive and mislead Plaintiffs into paying Defendant Gaogui's claims under the No-fault Law. Specific examples of the billing fraud alleged herein are contained in the body of this Complaint, as well as the exhibits in the accompanying Compendium of Exhibits.

164.    Defendants Gaogui and Yusupov knew the foregoing material misrepresentations to be false when made and nevertheless made these false representations with the intention and purpose of inducing Plaintiffs to rely thereon.

165.    Plaintiffs did in fact reasonably and justifiably rely on the foregoing material misrepresentations and upon a state of facts, which Plaintiffs were led to believe existed as a result of the acts of fraud and deception of Defendants Gaogui and Yusupov.

166.    Had Plaintiffs known of the fraudulent content of the bills, prescriptions, and delivery receipts, they would not have paid Defendants Gaogui's claims for No-fault insurance benefits submitted in connection therewith.

167.    Furthermore, the far-reaching pattern of fraudulent conduct by Defendants Gaogui and Yusupov evinces a high degree of moral turpitude and wanton dishonesty, which, as alleged above, has harmed, and will continue to harm the public at large, thus entitling Plaintiffs to recovery of exemplary and punitive damages.

168.    By reason of the foregoing, Plaintiffs have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined but believed to be in excess of $283,000.00, the exact amount to be determined at trial, plus interest, costs, punitive damages, and other relief the Court deems just.

### THIRD CLAIM FOR RELIEF

### AGAINST DEFENDANTS GAOGUI AND YUSUPOV

### (Unjust Enrichment)

169.    The allegations of paragraphs 1 through 143 are hereby repeated and realleged as though fully set forth herein.

170.    By reason of their wrongdoing, Defendants Gaogui and Yusupov have been unjustly enriched, in that they have, directly and/or indirectly, received moneys from Plaintiffs that are the result of unlawful conduct and that, in equity and good conscience, they should not be permitted to keep.

171.    Plaintiffs are therefore entitled to restitution from Defendants Gaogui and Yusupov in the amount by which it has been unjustly enriched.

172.    By reason of the foregoing, Plaintiffs have sustained compensatory damages and been injured in their business and property in an amount as yet to be determined, but believed to be in excess of $283,000.00, the exact amount to be determined at trial, plus interest, costs, and other relief the Court deems just.

**FOURTH CLAIM FOR RELIEF**

**AGAINST THE RETAIL DEFENDANTS**

**(Declaratory Judgment under 28 U.S.C. § 2201)**

173.    The allegations of paragraphs 1 through 143 are hereby repeated and realleged as though fully set forth herein.

174.    At all relevant times mentioned herein, each and every bill mailed by Yusupov, through Gaogui, to Plaintiffs sought reimbursement in excess of the amounts authorized by the No-fault Law and effective DME Fee Schedule by materially misrepresenting the DME provided, if provided at all, as well as the cost and quality of the billed for Rental DME.

175.    To the extent the Rental DME were provided at all, each item was medically unnecessary because it was provided pursuant to a predetermined course of treatment, irrespective of medical need.

176.    At all times relevant herein, the Retail Defendants exploited the No-fault Law and applicable Fee Schedule through the utilization of various deceptive billing tactics engineered to maximize the amount of reimbursement from insurers, in general, and Plaintiffs, in particular, through the submission of fraudulent billing documents that misrepresented the amounts the Defendants were entitled to be reimbursed, as well as the medical necessity of the items purportedly provided to Covered Persons.

177.    In view of the Retail Defendants' submission of fraudulent bills to Plaintiffs, Plaintiffs contend that the Retail Defendants have no right to receive payment for any pending bills it has submitted because:

- The Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs to obtain reimbursement far in excess of the maximum permissible charges they could submit to Plaintiffs; and

- The Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs seeking reimbursement for DME that was provided pursuant to a predetermined protocol of treatment without regard to medical necessity.

178. As the Retail Defendants have knowingly made the foregoing false and fraudulent misrepresentations about the DME purportedly supplied to Covered Persons and the amounts it was entitled to be reimbursed, in order to manipulate the payment formulas under the No-fault Law and effective DME Fee Schedules in its claims submissions, obtain reimbursement far in excess of the maximum permissible charges it was entitled to receive for medically unnecessary items provided pursuant to a fraudulent protocol of treatment, it is respectfully requested that this Court issue an order declaring that the Retail Defendants are not entitled to receive payment on any pending, previously-denied and/or submitted unpaid claims and Plaintiffs, therefore, are under no obligation to pay any of the Retail Defendants' No-fault claims.

179. Plaintiffs have no adequate remedy at law.

180. The Retail Defendants will continue to bill Plaintiffs for false and fraudulent claims for reimbursement absent a declaration by this Court that Plaintiffs have no obligation to pay the pending, previously-denied and/or submitted unpaid claims, regardless of whether such unpaid claims were ever denied, regardless of the purported dates of service.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demands a trial by jury.

**WHEREFORE,** Plaintiffs demand judgment as follows:

i) Compensatory damages in an amount in excess of $283,000.00, the exact amount to be determined at trial, together with prejudgment interest;

ii) Punitive damages in such amount as the Court deems just;

iii)     Treble damages, costs, and reasonable attorneys' fees on the First Claim for Relief, together with prejudgment interest;

iv)     Compensatory and punitive damages on the Second Claim for Relief, together with prejudgment interest;

v)     Compensatory damages on the Third Claim for Relief, together with prejudgment interest;

vi)     Declaratory relief on the Fourth Claim for Relief, declaring that Plaintiffs have no obligation to pay any No-fault claims submitted by the Retail Defendants because (1) the Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs to obtain reimbursement far in excess of the maximum permissible charges they could submit to Plaintiffs; and (2) the Retail Defendants made false and fraudulent misrepresentations in the bills and supporting documentation submitted to Plaintiffs seeking reimbursement for DME that was provided pursuant to a predetermined protocol of treatment without regard to medical necessity; and

vii)     Costs, reasonable attorneys' fees, and such other relief that the Court deems just and proper.

Dated: New York, New York,
       March 12, 2024

                            Morrison Mahoney LLP

                            By:    /s/ Lee Pinzow
                                 Robert A. Stern, Esq.
                                 James McKenney, Esq.
                                 Kristy R. Eagan, Esq.
                                 Lee Pinzow, Esq.
                                 Attorneys for Plaintiffs
                                 Wall Street Plaza
                                 88 Pine Street, Suite 1900
                                 New York, New York 10005
                                 (212) 825-1212

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY, ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY AND ALLSTATE PROPERTY AND CASUALTY INSURANCE COMPANY,<br><br>                                                         Plaintiffs,<br><br>        -against-<br><br><br>ARTHUR YUSUPOV, GAOGUI LEASING CORP, JOHN DOES 1 THROUGH 5 AND ABC CORPORATIONS 1 THROUGH 5,<br><br>                                                         Defendants. | CIVIL ACTION<br><br>24-CV-1829<br><br>COMPLAINT<br><br>(TRIAL BY JURY DEMANDED) |

# COMPLAINT

MORRISON MAHONEY, LLP
ATTORNEYS FOR PLAINTIFFS
WALL STREET PLAZA
88 PINE STREET, SUITE 1900
NEW YORK, NEW YORK 10005
TELEPHONE: (212) 825-1212